COMMONWEALTH *vs.* DERYCK LONG & another.[1]

Norfolk. April 9, 2009. - August 17, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Electronic Surveillance. Evidence,* Wiretap. *Imprisonment,* Inmate telephone calls. *Constitutional Law,* Search and seizure, Probable cause. *Search and Seizure,* Warrant, Electronic surveillance, Affidavit, Probable cause. *Probable Cause.*

Discussion of the requirement of the Massachusetts wiretap act, G. L. c. 272, § 99, that there be probable cause to believe that a designated offense has been, is being, or is about to be committed; the definition of a designated offense; and the requirement that an application for a wiretap warrant include a statement of facts establishing that probable cause. [550-551]

This court concluded that where, in an affidavit accompanying an application for a warrant for a wiretap, copies or sufficiently detailed descriptions of tangible or recorded oral evidence have not been included, the judge hearing a pretrial motion to suppress evidence derived from that wiretap must conduct a de novo review of the affidavit and omitted evidence to determine whether there was probable cause to authorize the wiretap, regardless of whether the failure to include the evidence in the warrant application was intentional or reckless [551-554]; thus, where a State trooper applying for a warrant for a wiretap did not attach to his affidavit recordings of the defendant's telephone conversations with persons the trooper believed to be involved in a conspiracy to hide evidence concerning the defendant's indictment, the judge did not err in making additional findings based on those recordings and in using those findings to make a determination whether probable cause existed [554-555].

A Superior Court judge properly allowed the criminal defendants' pretrial motions to suppress evidence derived from a wiretap placed, pursuant to a warrant, on the telephone in a visitation booth at a house of correction, where, in the affidavit that accompanied a State trooper's application for the wiretap warrant, the trooper did not establish a reasonable suspicion that the authorization of a wiretap would lead to evidence of a designated offense committed in the course of a continuing enterprise to supply illegal goods and services, as required by G. L. c. 272, § 99. [555-558]

INDICTMENTS found and returned in the Superior Court Department on March 9, 2006, and November 1, 2006, respectively.

[1]Paul Brown.

Pretrial motions to suppress evidence were heard by *Janet L. Sanders*, J.

An application for leave to file an interlocutory appeal was allowed by *Botsford*, J. in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her.

*Varsha Kukafka*, Assistant District Attorney, for the Commonwealth.

*Bernard Grossberg* for Deryck Long.

*Kevin M. Mitchell* for Paul Brown.

Spina, J. This appeal concerns a wiretap on a telephone in a visitation booth at the Norfolk County house of correction (jail) pursuant to a warrant issued under G. L. c. 272, § 99 E and I. Late in the evening on January 9, 2006, two perpetrators shot Jamal Vaughn to death and absconded. The police investigation immediately focused on the defendant, Deryck Long. On January 10, 2006, Long was arrested in connection with several outstanding warrants and arraigned for Vaughn's murder the following day. On January 12, 2006, investigators determined that more than one shooter had shot Vaughn.

While incarcerated, Long placed several outgoing telephone calls, all of which were recorded pursuant to jail policy,[2] including several to his girl friend, Tayna Newsome. On one occasion, Newsome orchestrated a three-way call among Long, herself, and Courtney Forde, Long's friend. Steven Reilly, the assistant deputy superintendent of investigations at the jail, provided State Trooper John Moran with recordings of Long's outgoing telephone calls. Based on those telephone calls, described in greater detail *infra*, Trooper Moran inferred that Long intended to use the telephones in the visitation booths at the jail to urge his visitors to conceal evidence relating to Vaughn's murder and prevent his indictment by intimidating and possibly murdering an eyewitness to the murder. He also inferred that Long would disclose or discuss the identity of the second shooter. The visitation booth telephones were not recorded by the jail, nor does there appear to have been

---

[2]At the beginning of each telephone call, the caller and party to whom the telephone call was placed were advised that the telephone calls were being monitored. Neither defendant challenges this policy. See *Commonwealth* v. *Boyarsky*, 452 Mass. 700, 705-706 (2008).

any warning to prisoners and visitors that conversations over those telephones would be recorded.

Trooper Moran sought, and a Superior Court judge authorized, a wiretap for the telephone in a specific visitation booth in the maximum security area of the jail. Neither the warrant application nor Trooper Moran's affidavit in support thereof contained copies of any of the outgoing telephone conversations referred to in Trooper Moran's affidavit. See G. L. c. 272, § 99 F 3. Long subsequently made incriminating statements using the visitation booth telephone subject to the wiretap.

After being indicted for Vaughn's murder, Long moved to suppress the wiretap evidence and the fruits thereof, arguing, among other things, that the facts alleged in Trooper Moran's affidavit did not establish that wiretapping the visitation booth telephone would lead to evidence of a designated offense in connection with organized crime, see G. L. c. 272, § 99 B 7, 99 E 2[3]; and that the affidavit did not show that normal investigative procedures had been tried and failed or reasonably appeared to be unlikely to succeed if tried, see G. L. c. 272, § 99 E 3. After reviewing the recorded, outgoing telephone conversations, Long filed a supplemental motion to suppress, contending that Trooper Moran made false, material omissions deliberately or with reckless disregard for the truth, and requested a hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154 (1978).

The defendant Paul Brown, who later was indicted as the second shooter, also filed a motion to suppress and a supplemental

---

[3]General Laws c. 272, § 99 B 7, provides:

"The term 'designated offense' shall include the following offenses in connection with organized crime as defined in the preamble: arson, assault and battery with a dangerous weapon, extortion, bribery, burglary, embezzlement, forgery, gaming in violation of [G. L. c. 271, § 17], intimidation of a witness or juror, kidnapping, larceny, lending of money or things of value in violation of the general laws, mayhem, murder, any offense involving the possession or sale of a narcotic or harmful drug, perjury, prostitution, robbery, subornation of perjury, any violation of this section, being an accessory to any of the foregoing offenses and conspiracy or attempt or solicitation to commit any of the foregoing offenses."

The preamble defines "organized crime" as "consist[ing] of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." G. L. c. 272, § 99 A.

motion to suppress the wiretap evidence, asserting the same arguments raised by Long's motions. He also requested a *Franks* hearing.

A Superior Court judge allowed the defendants' motions for a *Franks* hearing. After a hearing at which Long's outgoing telephone conversations — relied on by Trooper Moran in his affidavit — were admitted in evidence, the judge allowed the defendants' motions to suppress.[4] She found that Trooper Moran intentionally or with reckless disregard for the truth omitted important contextual details in his affidavit when he described Long's outgoing telephone conversations, from which he inferred Long was engaged in a nefarious, organized plot to intimidate or murder an eyewitness to Vaughn's murder. Taking the omitted facts into account, she ruled, inter alia, that the police failed to exhaust normal investigative procedures and, in any event, that there was not probable cause to believe that a "designated offense," see note 3, *supra*, had been, was being, or would be committed as the crimes and conspiracy alleged by Trooper Moran lacked a nexus to "organized crime." See G. L. c. 272, § 99 A; *Commonwealth* v. *Thorpe*, 384 Mass. 271, 277 (1981), cert. denied, 454 U.S. 1147 (1982). A single justice of this court allowed the Commonwealth's application for leave to file an interlocutory appeal, see Mass. R. Crim. P. 15 (a) (1), as appearing in 422 Mass. 1501 (1996), and transmitted the case to the full court.

The Commonwealth contends that the defendants' motions to suppress the wiretap evidence should not have been allowed because (1) the police had pursued normal investigative procedures to no avail and other normal investigative procedures were unlikely to be successful; (2) the judge's consideration of Long's outgoing telephone conversations in their entirety exceeded the four corners of Trooper Moran's affidavit; and (3) Trooper Moran's affidavit established a nexus to "organized crime," as

---

[4]The record on appeal contains only selected transcripts of Long's recorded outgoing telephone calls. Recordings of outgoing telephone conversations that were before the motion judge but not transcribed have not been included in the record on appeal. With one exception, see note 8, *infra*, the Commonwealth does not contend that the motion judge's findings are clearly erroneous. Having no record from which we may review findings based on the untranscribed, outgoing telephone calls, we accept those findings as true.

defined by G. L. c. 272, § 99 A. We disagree with the Commonwealth as to the latter two contentions, and we affirm.

1. *Facts.* We recite the facts contained in Trooper Moran's affidavit, as well as any reasonable inferences therefrom. See *Commonwealth* v. *O'Day*, 440 Mass. 296, 297-298 (2003). As discussed *infra*, we find no error in the motion judge's consideration of Long's recorded telephone conversations in their entirety, and we therefore summarize her findings of fact not contained in Trooper Moran's affidavit.

On January, 9, 2006, Vaughn was with Lyndia Lewis, Taneisha James-Pagan, and Cory Gibbons at James-Pagan's apartment in Quincy. Shortly before midnight, Vaughn went to his motor vehicle to retrieve a pack of cigarettes and was shot multiple times. When Lewis heard gunfire, she rushed outside and saw Long, whom she knew through her roommate, Janet Ojo, running from where Vaughn had been shot. Vaughn was rushed to Quincy Medical Center, where he was pronounced dead. Crime scene investigators recovered several shell casings and a palm print on the hood of a car parked in the area where the shell casings were found. At this point, the police did not know that there was a second shooter.

The following day Trooper Moran interviewed Ojo. Ojo and Lewis resided in an apartment in the South Quincy area of Quincy (apartment). Ojo told Trooper Moran that she had received a telephone call from James-Pagan the night of the murder informing her that there had been an incident at the apartment that evening in which Vaughn and Long became engaged in a physical fight and that Vaughn had prevailed over Long. When Trooper Moran and another investigator discussed Ojo's account with James-Pagan, James-Pagan confirmed that she had witnessed the altercation between Long and Vaughn at the apartment, and had heard Long yell to another individual, "C," for help.[5]

On the same day, Trooper Moran learned through a criminal background check that Long had a lengthy criminal record that included outstanding arrest warrants for intimidation of a wit-

---

[5]James-Pagan also told Trooper Moran that while she did not see who shot Vaughn, she was sure it was Long because he had a reputation for carrying guns, was seen with ammunition at the apartment two weeks earlier, and had talked of shooting people in the past.

ness, assault and battery, and distribution of a class D substance. Long was arrested on those outstanding warrants that afternoon.

On January 11, 2006, Long was arraigned in the Quincy Division of the District Court Department on a charge of murder. By this time it also had been determined that the palm print recovered from the murder scene did not match Long's palm print.

During another interview on January 11, Ojo told Trooper Moran that Long's nephew, Richard Long (Richard), and another individual known as "Casino" were the only friends of Long's whom she knew. Subsequent interviews of James-Pagan's neighbors revealed that Casino had telephoned two women who lived in the same building as James-Pagan late and unexpectedly on the evening of the murder. One of the women gave Casino's Nextel "direct connect" cellular number to the State troopers who interviewed her.[6] Nextel Communications identified Courtney Forde as the subscriber for the direct connect number provided to the State troopers. The records for Forde's direct connect number indicated that a cellular telephone tower in South Quincy, where the apartment was located, was used for a direct connect transmission at 9:44 P.M. on January 9, 2006, which was around the time that Long and Vaughn fought, and that at 11:58 P.M., about the time of Vaughn's murder, a cellular telephone tower located approximately one-half mile from the murder scene was utilized for a direct connect transmission.

On January 12, a State trooper with the ballistics section informed Trooper Moran that the bullets retrieved from Vaughn's body came from two different firearms. A surveillance recording from a store located directly behind James-Pagan's building, acquired on the same day, had captured the shooting and showed two distinct muzzle flashes coming from separate locations within the same general area.

The following day, Trooper Moran went to the jail and spoke with Reilly. Reilly played recordings of Long's outgoing telephone conversations with his girl friend, Newsome, for Trooper Moran. In one conversation, Long told Newsome that regarding "the visitor thing . . . I would love to see you as soon as pos-

---

[6]In his affidavit, Trooper Moran explained that "Nextel Cellular phones operate by transmissions from the hand-sets to and from cell towers."

sible . . . I need to politic with you outside this airway." In another conversation, Long told Newsome he "needs for [Richard] or [Newsome] . . . if you don't mind to see me within a certain time because if I get indicted it's a wrap . . . you know what I'm saying . . . but you know if . . . one of you all at least can come see me . . . I mean . . . I'll be able to save that indictment." During one of these conversations, Newsome and Long acknowledged that they knew that Lewis claimed she saw Long running from the murder scene.

On January 17, Trooper Moran returned to the jail to listen to another recording of a telephone call between Long and Newsome. Long had telephoned Newsome, who then telephoned Forde. In this three-way conversation, Forde told Long that he was "laying low" and that he had people submit requests to visit Long at the jail.[7] Long told Forde to "fall back . . . way back."

A criminal background check of Forde indicated that he had a significant criminal history, including a conviction of possession of a firearm, and four open cases for "drug violations and threatening." Given Long's association with Forde, Forde's conviction of possession of a firearm, and the proximity of the direct connect transmissions from Forde's telephone to two women residing in the same building where the murder took place, Trooper Moran concluded that there was probable cause to believe that Forde was the second shooter.

Based on his twelve years of training and experience, and the facts that Long had a conviction of intimidation of a witness, knew the identity of the eyewitness, and wanted to speak with his associates without the conversation being recorded before being indicted so he could prevent his indictment, Trooper Moran opined that Long planned to use the visitation booth telephones at the jail to mastermind a plan to prevent Lewis from testifying against him, possibly even instructing visitors to murder Lewis. Trooper Moran also stated that there was probable cause to believe that information concerning Vaughn's murder, such as the identity of the second shooter and the location of the firearms used, would be communicated by Long over the visitation booth telephone.

---

[7]Reilly told Trooper Moran that Althea Forde, believed to be Forde's mother, and Gillian Gibbs, believed to be Forde's aunt, submitted requests to visit Long.

After reviewing, in their entirety, the outgoing telephone con-
versations mentioned in Trooper Moran's affidavit, the motion
judge found that Trooper Moran failed to mention that during
one conversation with Richard, whom Trooper Moran had im-
plicated in Long's plans concerning Lewis, neither Richard nor
Long made any statement tending to support Trooper Moran's
belief that Richard was part of a plot to intimidate or murder
Lewis.[8] She also found that Trooper Moran had completely
omitted any reference to Long's conversation with his friend
Gillian Gibbs, whom Trooper Moran had implicated in Long's
conspiracy to prevent his indictment, and that that conversation
provided no indication of any plot to harm Lewis or conceal
evidence.

The judge also found that Trooper Moran omitted important
contextual information in his description of Long's discussion
of Lewis with Newsome. She noted that Long discussed Lewis
only after Newsome pressed him for an assurance that he would
not be indicted for Vaughn's murder, and that Long described
Lewis as having no credibility and being a prostitute.

Additionally, the judge found that during the three-way tele-
phone conversation with Long, Newsome, and Forde, Forde told
Long that Richard had "tried to joke" with Forde about the
murder but Forde declined to respond. Long then said, "Right,
right, right, like I say just look out on that level for me man, just
fall back, way back." The judge noted that Long's advice to
Forde not to discuss the murder with anyone was not criminal in
itself.[9]

Trooper Moran testified that from all of Long's outgoing
telephone calls he selected the statements he considered most

---

[8]The Commonwealth correctly notes that Trooper Moran's affidavit
mentioned that he had listened to a conversation between Long and his nephew
Richard.

[9]The judge also found some of Trooper Moran's testimony not to be credible.
In his affidavit, Trooper Moran implicated Forde and other acquaintances of
Long in a conspiracy to murder Lewis. However, the judge found that his
concern for Lewis's well-being was belied by the fact that the police had
failed to arrest Forde, who was suspected of both having committed Vaughn's
murder and being involved in the conspiracy to conceal evidence concerning
the murder. In addition, Trooper Moran conceded that he had no direct
knowledge of any special efforts to protect Lewis, but knew that she was "of-
fered something" in terms of protection.

relevant to establishing probable cause, and that even though he did not attach to the warrant application the compact discs containing all of Long's outgoing telephone conversations, he would have had "no problem with doing that" and would have obtained any information requested by the judge from whom authorization had been sought.

2. *Discussion.* General Laws c. 272, § 99 E, provides that a warrant to conduct electronic surveillance may issue only:

> "1. Upon a sworn application in conformity with this section; and

> "2. Upon a showing by the applicant that there is *probable cause to believe that a designated offense has been, is being, or is about to be committed* and that evidence of the commission of such an offense may thus be obtained or that information which will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit a designated offense may thus be obtained; and

> "3. Upon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried"

(emphasis added). A designated offense includes:

> "the following offenses *in connection with organized crime as defined in the preamble*: arson, assault and battery with a dangerous weapon, extortion, bribery, burglary, embezzlement, forgery, gaming in violation of [G. L. c. 271, § 17], intimidation of a witness or juror, kidnapping, larceny, lending of money or things of value in violation of the general laws, mayhem, murder, any offense involving the possession or sale of a narcotic or harmful drug, perjury, prostitution, robbery, subornation of perjury, any violation of this section, being an accessory to any of the foregoing offenses and conspiracy or attempt or solicitation to commit any of the foregoing offenses" (emphasis added).

G. L. c. 272, § 99 B 7.

An application for a wiretap warrant must include a "statement of facts establishing probable cause to believe that a par-

ticularly described designated offense has been, is being, or is about to be committed." G. L. c. 272, § 99 F 2 a. General Laws c. 272, § 99 F 3, set out in its entirety in the margin,[10] further provides, in pertinent part: "If the applicant's information and belief is derived from tangible evidence or recorded oral evidence, a copy or detailed description thereof should be annexed to or included in the application."

If probable cause is found to be wanting or the police fail to abide by any of the provisions set forth in G. L. c. 272, § 99, "[a]ny person who is a defendant in a criminal trial in a court of the commonwealth may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom . . . ." G. L. c. 272, § 99 P.[11]

a. *General Laws c. 272, § 99 F 3.* The Commonwealth, analyzing the motion judge's consideration of those portions of Long's recorded telephone conversations not attached to or described in detail in Trooper Moran's affidavit under the rubric of *Franks* v. *Delaware*, 438 U.S. 154 (1978), asserts that Trooper Moran's omissions were not deliberately false or made with reckless disregard for the truth. In making this argument, the Commonwealth assumes that *Franks* v. *Delaware, supra,* governs a motion to suppress wiretap evidence based on an affiant's omissions concerning recorded oral evidence.

---

[10]"Allegations of fact in the application may be based either upon the personal knowledge of the applicant or upon information and belief. If the applicant personally knows the facts alleged, it must be so stated. If the facts establishing such probable cause are derived in whole or part from the statements of persons other than the applicant, the sources of such information and belief must be either disclosed or described; and the application must contain facts establishing the existence and reliability of any informant and the reliability of the information supplied by him. The application must also state, so far as possible, the basis of the informant's knowledge or belief. *If the applicant's information and belief is derived from tangible evidence or recorded oral evidence, a copy or detailed description thereof should be annexed to or included in the application.* Affidavits of persons other than the applicant may be submitted in conjunction with the application if they tend to support any fact or conclusion alleged therein. Such accompanying affidavits may be based either on personal knowledge of the affiant or information and belief, with the source thereof, and reason therefor, specified." (Emphasis added.) G. L. c. 272, § 99 F 3.

[11]The Commonwealth does not contest that defendant Brown has standing to seek suppression of the wiretap evidence and any evidence resulting therefrom.

In *Franks* v. *Delaware, supra* at 155-156, the United States Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment [to the United States Constitution] requires that a hearing be held at the defendant's request." Intentionally or recklessly omitted material may also form the basis for mounting a challenge under *Franks* v. *Delaware, supra.* See *Commonwealth* v. *Pratt,* 407 Mass. 647, 658-659 (1990); *Commonwealth* v. *Corriveau,* 396 Mass. 319, 333-335 (1985); *Commonwealth* v. *Ramos,* 72 Mass. App. Ct. 773, 778 (2008); *Commonwealth* v. *Dion,* 31 Mass. App. Ct. 168, 170, 172-173 (1991); *United States* v. *Rumney,* 867 F.2d 714, 720 (1st Cir.), cert. denied, 491 U.S. 908 (1989). The defendant's initial burden is not a light one. See *Franks* v. *Delaware, supra* at 171; *Commonwealth* v. *Ramos,* 402 Mass. 209, 215 (1988) (defendant's affidavit offering account different from account in officer's affidavit not substantial preliminary showing); *Commonwealth* v. *Douzanis,* 384 Mass. 434, 437-438 (1981) (substantial preliminary showing required; factual errors in affidavit concerning information furnished by informant generally insufficient to require *Franks* hearing). See also *Commonwealth* v. *Lewin,* 405 Mass. 566, 585 (1989).[12]

If a hearing is ordered, the defendant must show by a preponderance of the evidence that the false statement or misimpression created by an omission was made either intentionally or with reckless disregard for the truth. *Franks* v. *Delaware, supra* at 156. When a defendant successfully establishes that a false statement or omission was intentionally or recklessly made, the judge proceeds to consider whether the false misstatement or misimpression was necessary to a probable cause finding. See *id.*; *Commonwealth* v. *Valdez,* 402 Mass. 65, 70-72 (1988). In the case of an affirmative misstatement, the judge examines whether

---

[12]Even where a defendant has not made a substantial preliminary showing, a judge may, in the exercise of discretion, order a *Franks*-type hearing. *Franks* v. *Delaware,* 438 U.S. 154 (1978). See *Commonwealth* v. *Nine Hundred & Ninety-Two Dollars,* 383 Mass. 764, 775 n.12 (1981).

the affidavit, purged of false material, establishes probable cause. See *Franks* v. *Delaware, supra; Commonwealth* v. *Valdez, supra* at 71; *Commonwealth* v. *Assad,* 393 Mass. 418, 422 (1984). In contrast, where an omission forms the basis for a *Franks* challenge, the judge considers whether the affidavit, supplemented by the omitted information, furnishes probable cause. See *Commonwealth* v. *Ramos, supra* at 777-779; *Commonwealth* v. *Dion, supra* at 173-174; *United States* v. *Rumney, supra* at 720. See also *Commonwealth* v. *Corriveau, supra.* In either case, if probable cause is found to be lacking, the warrant is voided, and the evidence and fruits thereof may be suppressed. *Franks* v. *Delaware, supra.*

We previously have not considered whether the *Franks* case controls where a defendant seeks suppression of wiretap evidence based on the use of truncated excerpts of oral recordings to establish probable cause and complete copies of that evidence have not been attached to the wiretap warrant application in accordance with G. L. c. 272, § 99 F 3 a. For the reasons that follow, we hold that where copies or sufficiently detailed descriptions of tangible or recorded oral evidence have not been included in an application for a wiretap warrant, see G. L. c. 272, § 99 F 3, the motion judge ordinarily need not be concerned with the *Franks* requirements, but shall, pursuant to G. L. c. 272, § 99 E and 99 F, conduct a de novo review of the affidavit and omitted evidence to determine whether there was probable cause to authorize a wiretap.

General Laws c. 272, § 99, was "designed to ensure that unjustified and overly broad intrusions on rights of privacy are avoided." *Commonwealth* v. *Vitello,* 367 Mass. 224, 231 (1975). Its preamble cautions that "the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth." G. L. c. 272, § 99 A. For this reason, "[t]he use of such devices by law enforcement officials must be conducted *under strict judicial supervision and should be limited to the investigation of organized crime*" (emphasis added). *Id.* In addition to limiting the circumstances in which a wiretap may be sought to organized crime, the statute requires a showing that "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." G. L. c. 272, § 99 E 3.

Construing G. L. c. 272, § 99, as whole, the statutory admoni-tion that "a copy or detailed description [of tangible evidence or recorded oral evidence] should be annexed to or included in the application" evinces a strong legislative preference to provide that evidence to the judge from whom a warrant is sought to en-sure that the limited circumstances in which a wiretap warrant may be sought are present. Although this provision is couched in precatory language, we think it entitles defendants to review any tangible evidence or recorded oral evidence that directly or in-directly bears on probable cause when those materials have not been attached to the warrant application. A defendant need not establish that the failure to include copies or detailed descriptions of that evidence was intentional or reckless. In these specific cir-cumstances and in a departure from our jurisprudence limiting review of probable cause to issue a search warrant to the four corners of an affidavit, see *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003), we conclude that a motion judge should make a de novo probable cause determination based on the affidavit ac-companying an application for a wiretap warrant *and* any omitted tangible or recorded oral evidence, regardless of whether the failure to include that evidence in the warrant application was intentional or reckless.

Here, Trooper Moran's belief that Long intended to use the visitation booth telephone to facilitate a conspiracy to cover up his involvement in Vaughn's murder was derived, at least in part, from Long's outgoing telephone calls urging others to visit him and encouraging them to ask others to visit him. To the extent Trooper Moran's suspicions derived from Long's pleas to Forde, Gibbs, Newsome, and Richard to visit him in jail, recordings of telephone conversations with those individuals should have been attached to the warrant application so the judge from whom a warrant was sought could determine whether legitimate reasons, such as the need for canteen money or the desire to see familiar faces, primarily motivated Long's request for visitors. Because Trooper Moran did not attach copies of Long's outgoing telephone conversations with persons Trooper Moran believed to be involved in the conspiracy to hide evidence concerning Vaughn's murder, the judge did not err in making additional findings based on

those recordings and using those findings to make a probable cause determination.[13]

b. *Probable cause and nexus to organized crime.* This case comes to us in a somewhat unique procedural posture in that the motion judge, after properly conducting a de novo review of the application for a wiretap warrant and the omitted telephone conversations, determined that there was not probable cause to believe that a "designated offense has been, is being, or is about to be committed." G. L. c. 272, § 99 E 2. Determining our standard of review is further complicated by the fact that the motion judge made credibility findings concerning Trooper Moran's testimony at the *Franks* hearing. See note 9, *supra.* Because those credibility findings are not essential to the motion judge's probable cause determination, we review the motion judge's probable cause determination de novo. Cf. *United States v. Kelley,* 482 F.3d 1047, 1051 (9th Cir. 2007), cert. denied, 128 S. Ct. 877 (2008), and cases cited (no deference owed to issuing judge where affidavit in support of search warrant has been partially redacted); *State v. Rabon,* 930 A.2d 268, 276 (Me. 2007) (de novo review where magistrate did not have opportunity to make probable cause determination following redaction of affidavit); 2 W.R. LaFave, Search and Seizure § 4.4 (c), at 551 (4th ed. 2004).

A wiretap warrant may only issue "[u]pon a showing . . . that there is probable cause to believe that a designated offense has been, is being, or is about to be committed . . . ." G. L. c. 272, § 99 E 2. A designated offense includes "the following offenses in connection with organized crime as defined in the preamble: . . . intimidation of a witness . . . , murder, . . . being an accessory to any of the foregoing offenses and conspiracy or attempt or solicitation to commit any of the foregoing offenses." G. L. c. 272, § 99 B 7. "Organized crime," as incorporated in the definition of "designated offense," means "a continuing con-

---

[13]We note that this case does not present a situation where requiring the police to attach or describe in detail the pertinent tangible or recorded oral evidence would, due to its sheer volume, impose a tremendous burden on the police and be largely unhelpful to a probable cause determination. Indeed, Trooper Moran testified that he would have been willing and able to provide the issuing judge with Long's recorded, outgoing telephone conversations had she requested them.

spiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." G. L. c. 272, § 99 A. See *Commonwealth* v. *Thorpe*, 384 Mass. 271, 277 (1981). Requiring a nexus with organized crime, which is not a prerequisite under the cognate Federal statute, *id.* at 277 n.6, operates as a limitation on the circumstances in which a wiretap may be sought. *Id.* at 279-281. See *Commonwealth* v. *Lykus*, 406 Mass. 135, 141 (1989). In determining whether the requisite connection to organized crime exists, we consider whether the materials supporting an application for a wiretap warrant demonstrate an objectively reasonable suspicion grounded in "articulable facts from which a reasonable person could conclude that interception would lead to evidence of a designated offense" in connection with organized crime. *Commonwealth* v. *Thorpe*, *supra* at 281. See *Commonwealth* v. *D'Amour*, 428 Mass. 725, 737 (1999); *Commonwealth* v. *Lykus*, *supra* at 141-142.

The definition of organized crime as "a *continuing* conspiracy among highly organized and disciplined groups *to engage in supplying illegal goods and services*" (emphasis added), conceives of organized crime as a continuing criminal operation usually, but not necessarily, for pecuniary ends. That is, organized crime must be demonstrated by some evidence of an ongoing illegal business operation. See *Commonwealth* v. *Thorpe*, *supra* at 277 n.6 (noting that statutory definitions of organized crime in other jurisdictions focus on elements of organization, discipline, and provision of illegal goods and services).[14] Consequently, our cases distinguish between criminal activity that is not organized crime, and "crimes requiring the high degree of discipline and organization of organized crime." *Commonwealth* v. *D'Amour*, *supra*. Inquiry into whether the facts recited in an application for a warrant to conduct electronic surveillance amount to reasonable suspicion that organized crime may be afoot has heretofore focused on the extent to which the organization and discipline particular to organized crime may reasonably be inferred. See *Commonwealth* v. *D'Amour*, *supra*; *Commonwealth* v. *Lykus*,

---

[14]We place greater significance on G. L. c. 272, § 99 A, than we have accorded other statutory preambles, see, e.g., *Milk Control Bd.* v. *Gosselin's Dairy, Inc.*, 301 Mass. 174, 179-180 (1938), because the term "designated offense" expressly incorporates the definition of "organized crime" in the preamble. G. L. c. 272, § 99 A.

*supra* at 142; *Commonwealth* v. *Thorpe, supra* at 281; *Commonwealth* v. *Abdul-Kareem,* 56 Mass. App. Ct. 78, 80 (2002). While "the class of people subject to wiretaps inclùdes more than 'full-time professional criminals,' " *Commonwealth* v. *D'Amour, supra* at 736, quoting *Commonwealth* v. *Thorpe, supra* at 278 n.6, coordination of efforts among cohorts standing alone is insufficient. See *Commonwealth* v. *D'Amour, supra* at 737. See also *Commonwealth* v. *Jarabek,* 384 Mass. 293, 296 (1981) (scheme between two municipal officials to extort kickback from single contractor did not constitute organized crime).

For a conspiracy to commit an offense enumerated in G. L. c. 272, § 99 B 7, to rise to the level of organized crime, there must, at the very least, be an organized plan from which one reasonably may infer the existence of an ongoing criminal operation. See *Commonwealth* v. *D'Amour, supra* at 736-737; *Commonwealth* v. *Lykus, supra* at 142 (ransom note referred to more than one kidnapper and indicated awareness that victim's parents had contacted police, and nature of kidnapping "len[t] itself to inferences of discipline and organization"); *Commonwealth* v. *Thorpe, supra* at 281 (requisite discipline and organization reasonably could be inferred given confidentiality and inaccessibility of sergeant's promotional examination); *Commonwealth* v. *Abdul-Kareem, supra.*

Here, Trooper Moran's affidavit, together with the judge's findings, does not establish a reasonable suspicion that the authorization of a wiretap would lead to evidence of a designated offense committed in the course of a continuing enterprise to supply illegal goods and services. See *Commonwealth* v. *Thorpe, supra.* Neither the affidavit nor the omitted outgoing telephone conversations provided any basis for inferring that Long's involvement in Vaughn's murder or the conspiracy to conceal evidence of his participation in the murder was related to a continuing criminal enterprise to "supply[] illegal goods and services." G. L. c. 272, § 99 A. There was no indication that Vaughn's murder was motivated by some pecuniary interest or that Long intended to compensate the persons implicated by Trooper Moran for their involvement in Vaughn's murder or its investigation. On the contrary, the application for a wiretap warrant suggests that retaliation or revenge motivated Vaughn's murder, and that Long wanted

to engage his friends and family to help him cover up evidence of his involvement in Vaughn's murder.

Furthermore, putting to one side the pecuniary motivation typically underlying organized crime, even if one infers that Long's requests for visits from Newsome, Forde, Gibbs, and Richard were to solicit help in covering up his involvement in Vaughn's murder, including discouraging or preventing Lewis from testifying, such a conspiracy falls short of a plan from which it reasonably could be inferred that they collectively participated in an ongoing, multi-transactional criminal enterprise. The other hallmarks of organized crime — discipline, organization, and a continuing nature — were utterly lacking. Based on the affidavit and omitted recordings of Long's outgoing telephone conversations, it can only reasonably be inferred that Vaughn's brutal murder was an isolated event and that Long intended to enlist his friends to help him conceal evidence linking him to it. The entire alleged conspiracy revolved around a single, albeit heinous, crime motivated by revenge. At most, those conspiratorial efforts amounted to coordination among cohorts.[15] This was insufficient to establish a nexus to organized crime. See *Commonwealth* v. *D'Amour, supra* at 737.[16] Accordingly, there was no probable cause to believe that a designated offense had been, was being, or was about to be committed. G. L. c. 272, § 99 E 2. The motion judge properly suppressed the wiretap evidence and evidence resulting therefrom.

3. *Conclusion.* For the foregoing reasons, the order allowing the defendants' motions to suppress is affirmed.

*So ordered.*

[15]Vaughn's murder also lacked a nexus to organized crime because, apart from the fact that there were two shooters, Trooper Moran's affidavit described no murder plot from which organized crime could reasonably be inferred. Contrast *Commonwealth* v. *D'Amour,* 428 Mass. 725, 736-737 (1999).

[16]Relying on *Commonwealth* v. *D'Amour, supra* at 737, the Commonwealth argues that the police lacked a clear picture of the players involved and that more evidence would have been necessary to make clear that Long's conduct was unrelated to organized crime. Because we agree with the motion judge that there was insufficient evidence of a nexus with organized crime, we reject the Commonwealth's argument that additional evidence was necessary to establish that Vaughn's murder and the conspiracy to conceal it were unrelated to organized crime.